UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

JEFFRY ALEJANDRO PENA-BENCOSME,

                Petitioner,

              **MEMORANDUM AND ORDER**
   vs.                 06-CV-6745 (NGG)

WARDEN, METROPOLITAN CORRECTIONAL
CENTER, EASTERN DISTRICT OF NEW YORK,

                Respondent.

--------------------------------------------------------X

GARAUFIS, United States District Judge.

      Jeffry Alejandro Pena-Bencosme ("Pena-Bencosme") petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (Petition for Writ of Habeas Corpus (Docket Entry #11) ("Petition").) Pena-Bencosme challenges Magistrate Judge Steven M. Gold's ("Judge Gold") grant of the Government's request to certify Pena-Bencosme's extradition to the Dominican Republic, where he stands charged with voluntary homicide in the shooting death of police officer Santiago Fortuna Sanchez. (November 13, 2006 Memorandum and Order ("November 13, 2006 M&O") in Case No. 05-M-1518.)

      After Pena-Bencosme filed his habeas petition, Judge Gold reopened the extradition proceedings, and on October 30, 2007, denied Pena-Bencosme's request for reconsideration of the original decision. (October 30, 2007 Memorandum and Order ("October 30, 2007 M&O") in Case No. 05-M-1518.) Thereafter, this court granted Pena-Bencosme's request to file limited supplemental briefing, which he did on January 14, 2008. The Government responded on

1

January 23, 2008, and the parties appeared for oral argument on February 1, 2008. For the reasons set forth below, Pena-Bencosme's habeas petition is DENIED.

**I.     Background**

Initial Extradition Hearing

In support of extradition at the initial hearing, the Government presented an affidavit prepared by a prosecutor in the Dominican Republic and a Case Report, both of which described the statements of four eyewitnesses to the shooting. The eyewitness accounts stated that Pena-Bencosme shot Fortuna Sanchez without provocation after Pena-Bencosme had been urinating in the street, Fortuna Sanchez had asked him to stop, and Pena-Bencosme had been verbally abusive to Fortuna-Sanchez. (November 13, 2006 M&O at 9-10.) The Government also provided ballistics and forensic reports purporting to show that a bullet recovered from Fortuna Sanchez's body came from Pena-Bencosme's gun and that a bullet recovered from Pena-Bencosme's body did not come from Fortuna Sanchez's gun. (Id. at 12.)

Pena-Bencosme disputed the Government's version of the facts, arguing that he shot Fortuna Sanchez only after Fortuna Sanchez shot him. (Id. at 8.) He offered testimony from eyewitnesses stating that Fortuna Sanchez had threatened Pena-Bencosme prior to the shooting, that Fortuna Sanchez had in fact fired the first shot, and that Pena-Bencosme had acted in self-defense. (Id. at 13-14.) Two of those witnesses had first been presented by the Government in support of their extradition request, but now attested that there were "omissions and distortions" in the statements submitted by the Dominican prosecutor "that might mislead the reader." (Id. at 14-15.) Both witnesses claimed that their original statements did not include their descriptions of Fortuna Sanchez's intoxication, his role as the aggressor, and their opinions that Pena-Bencosme

2

acted in self-defense. (Id. at 15.) None of Pena-Bencosme's evidence called into question the Government's assertion that he fired his weapon and shot Fortuna Sanchez.

Judge Gold acknowledged that Pena-Bencosme's evidence was troubling and raised "substantial questions" about the Government's proof. (Id. at 19.) Nevertheless, Judge Gold concluded that the defense affidavits were not admissible in an extradition proceeding and that, even if they were, they would not defeat probable cause. (Id. at 20.) Specifically, Judge Gold found that there was little reason to believe that the witness statements presented by Pena-Bencosme were more accurate than those submitted by the prosecution, that the incriminating statements of two other eyewitnesses supporting the Government's version of events stood unqualified, and that the ballistics evidence indicating that Pena-Bencosme was shot by a gun other than Fortuna Sanchez's remained uncontradicted. (Id. at 20.) Judge Gold concluded that at most, Pena-Bencosme's evidence raised factual disputes that should be resolved at trial in the Dominican Republic and thus was insufficient to defeat probable cause. (Id. at 21-22.)

In addition to finding that the Government had met its probable cause burden, Judge Gold found that extradition would be warranted for two reasons even if Pena-Bencosme had persuasively countered the Government's proof and established that he was acting in self-defense. First, under Dominican Republic law, self defense is an affirmative defense (id. at 8-9), evidence of which is not properly considered in an extradition proceeding, see Matter of Extradition of Rabelbauer, 638 F.Supp. 1085, 1089 (S.D.N.Y. 1986) ("An accused may not offer evidence in the nature of a defense at an extradition hearing."). Second, under Dominican Republic law self-defense is not a complete defense to homicide but rather a basis for a sentence reduction. (November 13, 2006 M&O at 8-9.)

3

Finally, Pena-Bencosme argued that the extradition request should be denied because he feared for his safety if returned to the Dominican Republic. (Id. at 22.) Judge Gold rejected the argument based on the firmly established "rule of non-inquiry," which prohibits an extraditing court from inquiring into the degree of risk an extraditee will face after extradition. (Id. at 22-23.) Thus, Judge Gold granted the request for a certificate of extraditability against Pena-Bencosme. (Id. at 23.)

Initiation of Habeas Proceedings

On December 13, 2006, Judge Gold stayed the certificate of extraditability and directed the Clerk of Court to open Pena-Bencosme's Notice of Appeal of the November 13, 2006 M&O as a section 2241 petition. (Docket Entry #2.) In his Petition, Pena-Bencosme argues that (1) reliable and credible evidence was not presented to support Judge Gold's probable cause finding, (2) the Dominican Republic submitted a tailored version of the facts intended to deceive the court, (3) his due process rights were violated at the extradition hearing, and (4) the request for extradition was based on a defective warrant. (Petition at 1.)

With respect to the probable cause finding, Pena-Bencosme argues that the Government's evidence and Pena-Bencosme's evidence "showed a completely different picture of the incident," which raises "substantial questions regarding the integrity and reliability of the Dominican Republic's presentation." (Id. at 25-26.) Pena-Bencosme asserts that his evidence is trustworthy, in contrast to the Government's evidence, and that "the only credible evidence presented" showed that Fortuna-Sanchez shot first. (Id. 30-31.) Pena-Bencosme concedes that the ballistics report offered by the Government found one of two bullets removed from Fortuna-Sanchez's body "compatible" with Pena-Bencosme's gun, but argues that the report fails to identify which

4

of the bullets caused Fortuna Sanchez's death. Without proof that Pena-Bencosme's gun caused the death, he contends, "the government's submission lacks probable cause to believe Pena-Bencosme was responsible for the death of Fortuna Sanchez." (Id. at 32.) Nowhere in his submission does Pena-Bencosme deny or challenge the Government's contention that he shot Fortuna Sanchez.

The Government opposed the motion (Docket Entry #15), and this court granted Pena-Bencosme leave to request that Judge Gold reopen the extradition hearing to hear further evidence (May 29, 2007 Docket Text Entry), which he did.

Reconsideration Hearing

At an October 10, 2007 evidentiary hearing, Pena-Bencosme offered affidavits and live testimony from two of the four witnesses relied upon by the Government in support of its probable-cause showing. (See October 30, 2007 M&O at 2). Pena-Bencosme sought to show that the Dominican Republic had tailored its submissions in support of extradition to deceive the court "into falsely believing that the shooting of Santiago Fortuna Sanchez . . . was unprovoked and without justification" and to show that the Dominican prosecutor attributed incriminating statements to the eyewitnesses that they did not make. (Id. at 1-4.)

Judge Gold stated that if, in fact, each eyewitness had unequivocally denied making the original incriminating statements, he would "have serious doubts about the reliability of the Dominican Republic's submissions . . . and might vacate my finding of probable cause." (Id.) Judge Gold then conducted a detailed comparison of the original affidavits submitted by the Government, the defense affidavits submitted by Pena-Bencosme, and the testimony of the live witnesses. (Id. at 3-7.) Judge Gold found there was no basis upon which to conclude that the

Dominican prosecutor misrepresented the statements, particularly since the Government had since submitted copies of the witnesses' original signed statements, which showed that the prosecutor's statements had been taken "almost verbatim" from police interviews. (Id. at 9.)

Judge Gold acknowledged that Pena-Bencosme's contention that probable cause had been "obliterated" might be compelling if the witnesses "had denied signing their statements and stood by their defense affidavits at the hearing." (Id. at 9-10.) Instead, though the witnesses disputed the accuracy of their police statements, they acknowledged signing them and did not claim to have been coerced. (Id.) Moreover, two of the witnesses testified that the defense affidavits submitted by Pena-Bencosme did not accurately reflect their statements. (Id.) In short, Judge Gold concluded that "the evidence now consists of multiple versions of the same events, and there is no compelling reason to believe that any one of those versions is more or less reliable than any other." (Id. at 10.) Thus, rather than demonstrating fraud or obliterating probable cause, "the evidence presented by Pena-Bencosme ha[d] only created more confusion about what happened the night Fortuna Sanchez was shot." (Id. at 14.) Judge Gold noted that, even according to Pena-Bencosme's own statements and those of his friends, there was no doubt he was present and shot Fortuna Sanchez. While there was conflicting evidence about who fired the first shot, who saw the shots being fired, whether Fortuna Sanchez ever fired his weapon, and whether Pena-Bencosme's actions were justified in self defense, Judge Gold concluded that "[t]hese factual questions should be decided after a full trial in the requesting country." (Id.)

In addition, Pena-Bencosme raised the issue of whether the extradition requirement of dual criminality had been satisfied, which requires that the act done on account of which extradition is demanded must be considered a crime by both parties. (Id. at 15.) Specifically,

Pena-Bencosme argued that under the laws of New York and the United States, self defense "renders otherwise criminal conduct lawful" in contrast to the Dominican Republic's treatment of self-defense only as a mitigating factor for sentencing purposes. Id. Judge Gold rejected the argument on two grounds. First, he noted that the Extradition Treaty between the United States and the Dominican Republic has no explicit dual criminality requirement and thus, "dual criminality is not a prerequisite for extradition on a charge of voluntary homicide in defendant's case." (Id. at 17.)

Second, Judge Gold concluded that even if dual criminality were required, Pena-Bencosme would still be subject to extradition because he had not established that he acted in self defense and "there is probable cause to believe that Pena-Bencosme shot Fortuna Sanchez without justification. While the evidence on this issue may now be confused and inconsistent, this merely raises credibility question for trial." (Id.) Accordingly, Judge Gold denied Pena-Bencosme's motion for reconsideration of the November 13, 2006 M&O granting a certificate of extraditability but stayed extradition pending decision on the instant habeas Petition. (Id. at 18.)

In his supplemental briefing, Pena-Bencosme renews his argument that the Dominican Republic purposely has withheld evidence on whether Fortuna Sanchez fired his weapon on the night in question. (Petitioner's Counsel Robert P. LaRusso's January 14, 2008 Letter Brief to the court at 2.) Specifically, Pena-Bencosme contends that the Dominican Republic has "apparently ignored," Judge Gold's request for documentary proof to support the prosecutor's claim that Fortuna Sanchez's gun had been tested and found inoperable. Pena-Bencosme also contests Judge Gold's conclusion on dual criminality, arguing that the extradition treaty does not "single out" any enumerated offense, which thus requires application of the general principles of dual

criminality. (Id. at 3.) Pena-Bencosme contends that because self defense is applicable to sentence mitigation in the Dominican Republic but is a complete justification in the United States, the Dominican Republic crime of voluntary homicide is not a cognizable crime in the United States. (Id. at 3-4.) Thus, the principle of dual criminality "precludes Bencosme's extradition to the Dominican Republic to face a charge not recognizable in the United States." (Id. at 4.)

Finally, the court held oral argument on February 1, 2008, at which the court directed the Government to make additional efforts to obtain the documentation requested previously by Judge Gold, namely a ballistics report showing whether Fortuna Sanchez discharged his weapon the night of the shooting. In response to the Government's request, the Dominican Republic re-sent forensic documents that were already in the record. (See February 20, 2008 letter to the court from Robert P. LaRusso ("Docket Entry #29) at 2.) Pena-Bencosme again argues that this continued failure suggests that the Dominican Republic police may have deliberately tampered with Fortuna Sanchez's weapon in order to prevent a self-defense claim. (See id. at 2-3.)

## II. Discussion

A 28 U.S.C. § 2241 petition for a writ of habeas corpus is the only means for further judicial review of an extradition order, Murphy v. United States, 199 F.3d 599, 601 n. 1 (2d Cir. 1999), and such review is "narrowly circumscribed" and "quite deferential," Sandhu v. Burke, No. 97 Civ. 4608 (JGK), 2000 WL 191707 at *6-7 (S.D.N.Y. Feb. 10, 2000). A writ of habeas corpus "is not a means for rehearing what the magistrate has already decided" and is available "only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the

8

finding that there was reasonable ground to believe the accused guilty." Fernandez v. Phillips, 268 U.S. 311, 312 (1925); Orellana v. Parks, No. 01 Civ. 2126 (KMW), 2003 WL 1960268 at *4 (S.D.N.Y. March 25, 2003).

As Pena-Bencosme acknowledges, witness credibility and the weight of the evidence are "solely within the province of the extraditing magistrate." Austin v. Healey, 5 F.3d 598, 605 (2d Cir. 1993); see also Ornelas v. Ruiz, 161 U.S. 502, 508-09 (1896) ("[T]he judgment of the magistrate, rendered in good faith on legal evidence that the accused is guilty of the act charged, and that it constitutes an extraditable crime, cannot be reviewed on the weight of the evidence, and is final for the purposes of the preliminary examination, unless palpably erroneous in law."). Finally, "[t]he function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." Collins v. Loisel, 259 U.S. 309, 316 (1922).

The parties do not dispute Judge Gold's jurisdiction over the extradition proceedings pursuant to 18 U.S.C. § 3184, nor do they dispute that the Extradition Treaty between the United States and the Dominican Republic provides for extradition when an individual has been charged with murder or voluntary manslaughter. (See Complaint Ex. A, Arts. I, II.; Nov. 13 M&O at 2.)

Rather, as detailed *supra*, Pena-Bencosme asserts that the evidence he presented "demonstrates that the Dominican Republic purposely presented false and misleading information designed to deceive the Court into believing that the shooting was a deliberate act of murder rather than an act of self-defense." (Petition at 29.) Pena-Bencosme argues that "the only credible evidence presented during the extradition hearing showed that Fortuna Sanchez 'shot first,'" and that Pena-Bencosme's evidence suggests Dominican authorities may have

9

tampered with evidence to prevent a self-defense claim. (Id. at 30-31). Thus, he claims that Judge Gold erred in finding that the Government established probable cause.

First of all, "a judge presiding over an extradition hearing does not need to permit evidence which calls into question the credibility of the government's witnesses," Germany v. United States, No. 06 Civ. 01201(DLI), 2007 WL 2581894 at *8 (E.D.N.Y. Sept. 5, 2007), or which merely contradicts the Government's probable-cause proof, Shapiro v. Ferrandina, 478 F.2d 894, 905 (2d Cir. 1973) ("[T]he extraditee's right to introduce evidence is thus limited to testimony which explains rather than contradicts the demanding country's proof . . . ") (citation and internal quotation marks omitted); see also Sandhu, 2000 WL 191707 at *6 ("[W]hat tends to obliterate probable cause may be considered [by the extradition court] but not what merely contradicts it.") (citation and internal quotation marks omitted). In Shapiro, the Second Circuit held that the extraditing judge's refusal to examine the credibility of certain testimony and statements offered by the extraditee to call into question the validity of the Government's evidence was not error, because such statements "would only pose a conflict of credibility." Shapiro, 478 F.2d at 905. Judge Gold did, however, thoroughly consider all the evidence Pena-Bencosme presented, even that which primarily challenged the credibility of the Government's witnesses and contradicted its proof. Thus, Pena-Bencosme has been given an exceptionally fair hearing on these issues before Judge Gold.

Turning to the evidence Judge Gold considered, I find that there is "evidence warranting the finding that there was reasonable ground to believe the accused guilty." Phillips, 268 U.S. at 312. Although Pena-Bencosme disputes the reliability of the Government's evidence, he does not dispute that the witness statements, ballistic test results, and pathology reports establish at the

10

very least that he shot Fortuna Sanchez. Additional uncontradicted evidence from some eyewitnesses supports the Government's contention that Pena-Bencosme shot first and without provocation. This evidence supports Judge Gold's finding that the Government established probable cause that Pena-Bencosme committed voluntary homicide. See, e.g., Sandhu, 2000 WL 191707 at *13 (noting the unreliability of some of the Government's evidence, but upholding the extraditing Judge's finding of probable cause based on the combination of (1) a copy of a false driver's license with the defendant's photograph which was allegedly produced by a gunmen at the shooting, (2) photographs of fingerprint lifts taken from an automobile used by the perpetrators, and (3) testimony identifying the fingerprints as the defendant's that corroborated an eyewitness identification of the defendant).

    The fact that Pena-Bencosme called some of the Government's evidence into question is simply not enough to "obliterate" probable cause, absent proof that the evidence was inherently unreliable. See id. (noting that a coerced confession is an example of the type of evidence that should not be given much weight by an extradition court). Pena-Bencosme has offered no such proof, there is no evidence in the record that the original police statements were coerced, and the testimony of the live witnesses at the reconsideration hearing raised questions both about the original police statements and about the evidence Pena-Bencosme submitted contradicting those statements. As even the language of Pena-Bencosme's argument implicitly suggests, the significant questions that remain require choosing whose story to believe, which in turn requires determinations about the credibility of witnesses and the weight to be given the conflicting evidence. These tasks are outside the scope of an extradition proceeding and are properly left to a trial on the merits in the Dominican Republic. See Barapind v. Enomoto, 400 F.3d 744, 749

-750 (9th Cir. 2005) (noting that extradition courts do not weigh conflicting evidence in making their probable cause determinations; holding that the credibility of an affidavit that constituted conflicting evidence could not be assessed without a trial); see also Shapiro, 478 F.2d at 905 (holding that a "contest" between evidence posing a conflict of credibility should await trial in the extraditing country). Furthermore, Pena-Bencosme offers nothing more than speculation that the Dominican Republic is deliberately withholding forensic evidence about Fortuna Sanchez's gun. Even assuming such forensic evidence exists, I find that the evidence submitted by the Dominican Republic is sufficient to establish probable cause and that a forensic report suggesting that Fortuna Sanchez's gun was fired the night of the shooting would not defeat probable cause.[1] Under the deferential and narrowly circumscribed standard of review applicable to this case, this court finds that the evidence supported Judge Gold's finding of probable cause.

The court also rejects Pena-Bencosme's argument that extraditing him would violate the principle of dual criminality. The Second Circuit has recognized that "in applying the dual criminality requirement against a foreign statute, we have never considered only the statutory text. Rather, we have looked towards the conduct of the accused to see if it falls within the proscription of American criminal law." Lo Duca v. United States, 93 F.3d 1100, 1111 -1112 (2d Cir. 1996); see also Collins, 259 U.S. at 312 (the principle of dual criminality "does not require that the name by which the crime is described in the two countries shall be the same; nor

---

[1] As the court made clear at the most recent hearing, even the possibility that the Dominican Republic is withholding evidence concerns me. However, any such evidence would support only Pena-Bencosme's contention that he acted in self-defense, which does not act as a complete bar to prosecution — and therefore does not defeat probable cause — even if proved. (See Discussion *infra.*) In addition, I agree with Judge Gold that the other evidence submitted by the Dominican Republic, though contested, does not suggest fraud.

that the scope of the liability shall be coextensive, or in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions.") To determine whether dual criminality exists, an extradition court may look to federal law or the law of the state where the extradition proceeding is being held. Hu Yau-Leung v. Soscia, 649 F.2d 914, 918 (2d Cir. 1981).

As Judge Gold noted, under Article 295 of the Dominican Penal Code, "[h]e who voluntarily kills another person is guilty of homicide." (November 13, 2006 M&O at 8.) According to the Dominican prosecutor, the crime requires proof that the action was voluntary and that there was an intent to kill. (Id.) In New York State, a person is guilty of murder in the second degree when "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.25. Assuming, *arguendo*, that dual criminality is required for voluntary homicide under the Extradition Treaty, I find that the alleged conduct of the accused in this case could be charged as a crime under the New York State Penal Law.

In addition, Pena-Bencosme's argument that dual criminality is violated based on the difference in the way self defense functions under the two systems is unavailing. I agree with Judge Gold that Pena-Bencosme has not established that he acted in self defense and that whether he did is a question of fact for a jury in the Dominican Republic. What is more, self defense under New York law is just that: a justification offered as a defense to a murder charge, see N.Y. Penal Law § 35.15, which can result in an acquittal if proven. The conduct at issue here for which probable cause has been established — that Pena-Bencosme intentionally shot Fortuna Sanchez — is recognizable as a crime under New York law notwithstanding the fact that a

defendant in New York may successfully defend himself by showing that he acted in self defense, while a defendant in the Dominican Republic may introduce self defense only in mitigation of sentence. Thus, I conclude that the dual criminality requirement is met in this case.

Finally, Pena-Bencosme's argument that Judge Gold violated his due process rights by refusing to permit evidence that Pena-Bencosme faces danger if extradited to the Dominican Republic is unavailing. It is the settled law of this Circuit that "consideration of the procedures that will or may occur in the requesting country is not within the purview of a habeas corpus judge," nor is it "a proper matter for consideration by the certifying judicial officer." Ahmad v. Wigen, 910 F.2d 1063, 1066 (2d Cir. 1990). Indeed, even "the degree of risk to [appellant's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch," and as such, "[i]t is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds." Id. at 1067.

Needless to say, it concerns this court that Pena-Bencosme may face danger upon his return to the Dominican Republic. Under the above-cited "rule of non-inquiry," however, such considerations are outside this court's purview. Sindona v. Grant, 619 F.2d 167, 174 (2d Cir. 1980) ("Review by habeas corpus . . . tests only the legality of the extradition proceedings; the question of the wisdom of extradition remains for the executive branch to decide."). The court trusts that the U.S. State Department will consider the extent to which Pena-Bencosme's life may be threatened upon extradition, and, if appropriate, exercise its discretion to deny extradition on humanitarian grounds.[2]

---

[2] I decline to consider Pena-Bencosme's final argument that the request for extradition is based upon a defective warrant. (Petition at 40-42.) This issue appears to me to be outside the scope of habeas review. See Fernandez, 268 U.S. at 312. In any event, the Government has

**III.    Conclusion**

For the foregoing reasons, Pena-Bencosme's petition for a writ of habeas corpus is DENIED.  However, Pena-Bencosme's extradition shall be stayed for thirty days from the date of this Order to allow him to file a notice of appeal with the Second Circuit Court of Appeals if he so desires.  If Pena-Bencosme does file a timely appeal, the stay shall remain in effect until the Court of Appeals has rendered a decision on the appeal and issued a mandate or until other order of the Court of Appeals.


SO ORDERED.


|  |  |
|---|---|
| Dated: March 25, 2008<br>Brooklyn, N.Y. | s/ Nicholas G. Garaufis<br>NICHOLAS G. GARAUFIS<br>United States District Judge |

---

submitted a copy of a July 8, 2005 arrest warrant, issued prior to the extradition proceedings before Judge Gold, that appears to cure any alleged defect in the original warrant. (Government's Memorandum of Law in Opposition to Section 2241 Petition (Docket Entry # 15) at 18.)